RODOLFO F. APONTE, RENT ADMINISTRATOR OF PUERTO RICO, Petitioner, v. DISTRICT COURT OF SAN JUAN, Respondent; ANGEL M. VILLAMIL ET AL., Interveners.

No. 1. Argued November 6, 1947.—Decided December 4, 1947.

*Manuel Ledesma Dávila* for petitioner. *Vicente Géigel Polanco* for interveners Villamil and Crescioni. *E. T. Fiddler, José G. González, Tomás I. Nido, Jorge M. Morales, Ramón L. Nevares, Mariano Canales,* and *Andrés Guillermand* for intervener Warner Bros. Inc. *Charles R. Hartzell* and *Rafael G. Hernández* for intervener Rafael G. Martí.

MR. CHIEF JUSTICE TRAVIESO delivered the opinion of the Court.

The only question involved in the present proceeding, instituted pursuant to § 7 of "The Reasonable Rents Act" (Act No. 464 of April 25, 1946, Sess. Laws, p. 1326), is the following: Is the Rent Administrator of Puerto Rico empowered by the provisions of the Reasonable Rents Act to grant an increase of the rental stipulated by the parties in a lease contract for a fixed term, said contract being still in force at the time the increase in the rental is requested by the lessor?

These are the facts: Angel M. Villamil and Francisco A. Crescioni acquired, on September 29, 1945, by purchase from Manuel Pérez Blanco, a two-story house and a warehouse devoted exclusively to commercial offices. At the time of

the acquisition, the offices were leased under written contracts, thus:

"1. One-half of the first floor to Warner Bros., First National South Films, Inc., for $100 monthly, under a contract of April 1, 1936, for the term of 10 years, with an option to extend for 5 years which the lessee exercised.

2. The other half of the first floor to Rafael G. Martí, for $85 monthly, as per deed of April 21, 1936, for a term of 10 years, with an option to extend for 5 years which the lessee opportunely exercised.

3. The second floor of the building is leased to the United States Selective Service, without a fixed term, for $200 monthly, as per contract of July 1, 1945.

4. The warehouse to A. Alvarez Hnos., for a monthly rent of $200, as per deed of August 1937, for term of 10 years, with an option to renew for 5 years, which it now enjoys."

On November 22, 1946, the lessors Villamil and Crescioni filed with the Administrator, petitioner herein, a petition for the increase of the basic rent, in which they requested that an order be issued authorizing an increase of 50 per cent of the maximum rent on October 1, 1942, in the case of the four commercial premises "in accordance with the provisions of the Reasonable Rents Act and subdivisions (4), (5), and (6) of paragraph a of Article 5 of the Rent Regulation for commercial premises." On November 27, 1946, the Administrator issued an order denying the petition, and on December 9, 1946, he refused to reconsider that order.

Feeling aggrieved by the decision of the Administrator, the lessors applied to the district court, seeking to have the latter review and set aside the order issued by the Administrator. On May 28, 1947, the district court rendered a decision vacating the order issued by the Administrator as to the tenants Warner Bros. Inc., Rafael G. Martí, and A. Alvarez Hnos., and holding that the Administrator has power to decree the increase if the circumstances so warrant, notwithstanding the existence of a contract for a fixed term in which a uniform rental has been stipulated until the term

ination of the lease. The Administrator thereupon instituted the present proceeding, in which Warner Bros. Inc. and Martí have intervened as interested parties.

We now turn to consider and decide the fundamental question thus submitted to us.

The lessors maintain (*a*) that the second paragraph of § 6 of the Reasonable Rents Act[1] empowers the Administrator to fix reasonable rents over the basic rent prevailing on October 1, 1942; (*b*) that in case there is a contract entered into before October 1, 1942, fixing the rent which should be paid after such date, the rent fixed in the contract shall be considered as the *basic rent*, and the Administrator has power to fix a reasonable rent over said basic rent for the reasons stated in § 6 of the Act; and (*c*) that the grounds alleged by the lessors to justify the fixing of a reasonable rent—substantial increase in the number of occupants of one of the premises; extraordinary increase in the commercial importance of the district in which the properties are located; and an increase in the real estate taxes—are expressly stated

---

[1] "Section 6.—Except as hereinafter provided, on and after the effective date of this Act, rents higher than those paid on October 1, 1942, shall not be charged.

"In so far as it is not changed by the Administrator, according to the powers hereinafter conferred upon him, for the purposes of this Act, 'basic rent' shall be understood to be the rent paid on said date, unless some agreement has been made previous to that date, fixing a higher or lower rent for any period after such date. In this case, the basic rent shall be the rent agreed upon.

"In the case of buildings intended for businesses or commercial or industrial purposes, the Administrator may authorize reasonable increases over the rentals prevailing October 1, 1942, according to the commercial importance of the towns and districts where such buildings are located, and to the construction cost thereof; *Provided, however,* That such increases shall in no case exceed fifty (50) per cent of the rental prevailing October 1, 1942.

"The Administrator shall have power to fix the reasonable rent in all cases in which, in his judgment, the rent prevailing on October 1, 1942, or that which may have been fixed after said date, is excessive, unreasonable, or oppressive. He shall likewise have power to make adjustments and other rulings in cases covering improvements of capital importance, increase or reduction of furniture, equipment or accessories, increase or reduction in services and supplies, or deterioration of the dwellings or buildings leased."

in § 6 of the Reasonable Rents Act and in subdivisions (4), (5), and (6) of paragraph "a" of Art. 5 of the Rent Regulations for Commercial Premises.[2]

The first things that we should consider are the fundamental purpose of the Reasonable Rents Act, the historical background which gave rise to its enactment by the Legislature, and the evil which that statute sought to prevent or remedy.

At the beginning of the Reasonable Rents Act we find in § 1 thereof an extensive and clear statement of the reasons which the lawmaker had for enacting said statute, and of the evil conditions which were sought to be corrected by applying its provisions. "The speculation in the renting of lodgings, lots, houses, and buildings *on the basis of unfair, unreasonable, and oppressive rents;* and other economic and social factors aggravate the housing problem to the extent of creating *a condition of emergency* that affects the welfare, the health, the safety, and the lives of hundreds of thousands of women, men, and children throughout the rural districts

---

[2] "*a. Grounds for increase of maximum rent.* Any landlord may file a petition with the Administrator for the increase of the maximum rent only on one or more of the following grounds:

" .     .     .     .     .     .     .     .     .     .

"(4) *Peculiar Circumstances: unreasonable or oppressive rents:* The maximum rent, due to a substantial increase in the number of subtenants or other occupants, or to peculiar circumstances other than those expressly stated in this Article, appears unreasonable or oppressive for the landlord and is not in keeping with the rents prevailing for similar premises on the maximum rate date.

"(5)*Increase in taxes.* On the date determining the maximum rent, the premises in question were exempt from real estate taxes, the benefit of this tax exemption having been passed on to the tenant, and as a result the rent was lower than that prevailing for similar premises on the maximum rent date, and such exemption no longer exists; or there have been imposed, after such date, special or additional taxes which justify the increase of the rent.

"(6) *Commercial District; Construction Costs.* The importance of the commercial districts where the commercial premises are located or the construction cost thereof, if the building involved is of recent construction, justifies an increase of the maximum rent. The increases granted on the foregoing ground shall not exceed 50 per cent of the rent prevailing on October 1, 1942, or in default thereof, of the rent fixed by comparison."

and towns of Puerto Rico"; the fact that when the Act was passed 135,786 families lived in rented houses and apartments, "*paying excessive rent* in most cases and being the victims of oppressive speculative practices," such practices having been extended also to the houses and buildings used for commercial and industrial purposes; and the fact that due to the great demand for premises for commercial use "*numerous landlords have been and keep on imposing on their lessees* unfair, unreasonable, and abusive contracts; *have increased rents* up to amounts which in some cases exceed two hundred (200) per cent of the original rent, and are resorting to diverse practices of speculation and of violent ejectment of businesses and industries economically important to the country," were the grounds or reasons which moved the lawmaker to find a remedy for a situation which caused great prejudice to the welfare, the health, and the safety of a great number of persons, who not being the owners of the premises where they had established their homes or businesses, were the victims of oppressive speculative practices on the part of the lessors. The legislative intention is clearly set forth in the 4th paragraph of the above-mentioned statement of motives, which reads thus:

"To insure adequate protection for the people of Puerto Rico with respect to this serious housing problem, there is lacking, however, proper legislation in regard to rents, *to prevent speculation on the part of landlords, to guarantee reasonable rents, and conveniently to protect the right of tenants.*" (Italics ours.)

We fail to find, either in the statement of motives or in the body of The Reasonable Rents Act, a single word or phrase showing any concern on the part of the Legislature for the owners of residential or commercial premises who were bound by contract to lease those premises for a term of years and for a lower rent than that prevailing for similar premises on the date of the approval of the Act. It is evident that the Legislature was not disquieted over the fact that certain rents were low, and that it did feel concern-

ment when it realized that lessees who were not protected by long-term contracts were subjected to oppressive practices by their lessors who, taking advantage of the great demand for housing accommodations and for commercial and industrial premises, imposed upon the tenants onerous conditions and excessive rents. The intervention of the legislative power on behalf of those lessees who were not protected by long-term contracts was absolutely necessary to prevent the unreasonable increase of the rents, as it is well-known that the merchant or manufacturer who is compelled to pay an excessive rent, necessarily has to shift the excess to the consumer, either by increasing the price or by decreasing the weight or quantity of the product. On the other hand, to defend the "welfare, the health, and the safety of the people" it was not necessary that the administrator should be empowered to intervene and change the terms of an existing lease contract, with the sole purpose of increasing the rent voluntarily stipulated by the parties. No prejudice will be caused to the people if a lessor of real estate is not permitted to collect a higher rent than that specified in the contract. If the lawmaker had expressly authorized the Administrator to alter the terms of a contract for a fixed term increasing the rent stipulated by the parties, without said alteration being necessary for the protection of the welfare, the health or the safety of the people, which is the only thing that would justify the exercise of the police power of the State, the constitutionality of such an authorization would be very doubtful.

The cases of *Block* v. *Hirsh,* 256 U.S. 135, and *Marcus Brown Company* v. *Feldman,* 256 U.S. 170, cited by the lessors in support of their contention that the construction which they have given to the statute is constitutional, are not applicable to the situation presented to us by the case at bar. In the first of said cases, Hirsh bought a building in which Block was occupying the cellar and the first floor by virtue of a lease contract entered into with the prior owner and which expired on December 31, 1919. Upon being requested

by Hirsh to surrender the premises at the termination of the contract, Block declined and, in defending an action of unlawful detainer brought against him, he alleged that § 109 of the Act of October 22, 1919 (c. 80, Title II—"District of Columbia Rents," 41 Stat. 297, 298, 301) granted the lessee the right to continue, at his option, in the possession of the premises, notwithstanding the expiration of the lease term, as long as he paid the rent and performed the conditions fixed by the Commission created by said Act. In upholding the validity of the statute, the Supreme Court said:

"The main point against the law is that tenants are allowed to remain in possession at the same rent that they have been paying, unless modified by the Commission established by the Act, and that thus the use of the land and the right of the owner to do what he will with his own and to make what contracts he pleases are cut down. But if the public interest be established the regulation of rates is one of the first forms in which it is asserted, and the validity of such regulation has been settled since *Munn* v. *Illinois*, 94 U. S. 113. . . .

"Machinery is provided to secure to the landlord a reasonable rent. § 106. It may be assumed that the interpretation of 'reasonable' will deprive him in part at least of the power of profiting by the sudden influx of people to Washington caused by the needs of Government and the war, and thus of a right usually incident to fortunately situated property—of a part of the value of his property as defined in *International Harvester Co.* v. *Kentucky*, 234 U. S. 222. *Southern Ry. Co.* v. *Greene*, 216 U.S. 400, 414. But while it is unjust to pursue such profits from a national misfortune with sweeping denunciations, the policy of restricting them has been embodied in taxation and is accepted. It goes little if at all farther than the restriction put upon the rights of the owner of money by the more debatable usury laws. The preference given to the tenant in possession is an almost necessary incident of the policy and is traditional in English laws. If the tenant remained subject to the landlord's power to evict, the attempt to limit the landlord's demands would fail."

In the case at bar there is not involved a tenant who is holding over after the expiration of his lease contract and

who would be subject to eviction if he failed to accept the onerous and unjust conditions that the lessor might impose upon him. The tenants in this case are protected by contracts the terms of which will not expire until the year 1951. They are entitled to remain in the possession of their respective premises as long as they pay the stipulated rent and comply with all the other conditions of the lease. We repeat, we do not find in the Act any provision which directly or indirectly authorizes the administrator to intervene, at the instance of the lessor, in order to increase the rent agreed upon by the parties. The facts in *Marcus Brown Co.* v. *Feldman, supra,* are almost identical to those of *Block* v. *Hirsh,* there being involved also tenants who claimed their right, under the statutes of the State of New York, to continue in possession after the expiration of the lease contract. See *Leavy Leasing Co.* v. *Siegel,* 258 U.S. 242.

We are of the opinion that the lower court erred in entering the judgment appealed from, and that the same should be vacated and the case remanded to the lower court with directions to render a decision dismissing the petition.